ANTON FRIESENHAHN *vs.* WILLIAM M. BUSHNELL and another.

December 7, 1891.

**Agency to Purchase Real Estate.**—*Held*, upon the facts, that the defendants bore to plaintiff the relation of agents to invest his money in the purchase of real property for him.

**Same—Purchase by Agent from Himself—Repudiation by Principal.** *Also* that plaintiff had a right to repudiate the investment, and to demand a return of his money—*First*, because they did not communicate to him that they were the sellers of the property which they assumed to buy for him; and, *second*, because they themselves had repudiated the trust by treating the property as their own, and executing a mortgage upon it.

Appeal by defendants, William M. and Alvin R. Bushnell, from an order of the district court for Ramsey county, *Egan*, J., presiding, refusing a new trial after a verdict of $435.65 for plaintiff.

*Omar Bushnell*, for appellants.

*Otto K. Sauer*, for respondent.

MITCHELL, J. This action was brought to recover back money paid by plaintiff to defendants, to be by them, as his agents, invested for him in the purchase of real estate, but which it is alleged they never in fact invested. The substance of the answer, briefly stated, is that the money was received by defendants to be invested in what they call "investment No. 84, according to their investment plan," and that they had so invested it. We shall not attempt to explain the very novel and peculiar scheme which defendants call "their investment plan;" for, except so far as communicated and explained to the plaintiff, it is wholly immaterial in this case. Notwithstanding defend-

ants' attempted distinctions based on mere verbal quibbles, it is clear from the undisputed facts that the plaintiff paid over his money to defendants, to be by them, as his agents, invested for him in the purchase of real estate, that the relation of the parties was that of principal and agent, and therefore that their rights and liabilities are governed by the general rules of the law of agency, except so far as otherwise expressly agreed. It does appear that it was agreed and understood between the parties that, as plaintiff's money was not sufficient to buy an entire tract, it, and the money of other parties, would be put together and used in buying a tract of land for all of them, in which each was to have an interest in proportion to the amount of money he invested; that, for convenience' sake, the title was to be taken in the name of some third party, in trust for all those whose money was invested, and that when sold the defendants were to have the sale of it as agents for the parties in interest, for which services they were to receive a commission out of the proceeds of the sale, the balance of which was to be distributed among the investors in proportion to their respective interests.

According to defendants' testimony, they told plaintiff, when he intrusted the money to them, that they were "figuring" on the piece of property in which they now claim to have invested his money; that they considered it very cheap; that they had a very small interest in it, which they proposed to retain; that the other parties interested in it wanted to dispose of it; and that they (defendants) could buy it very reasonably. So far as appears, this was all that defendants disclosed to plaintiff as to the ownership or condition of the property. Subsequently they made a report to him that his money, and that of certain other parties, (including $250 of their own money,) amounting in all to $2,950, had been invested in the purchase of this property, subject to a mortgage for $2,000, payable in one and two years, making the cost of the property, when all paid for, $4,950. This report also stated that the title was taken in the name of one Hurd. This investment purported to have been made in May, 1887, immediately after plaintiff paid over his money. In 1888 and 1889, respectively, the defendants notified the plaintiff of the maturity of the instalments on the $2,000 mortgage on the property, and of the

amount which he was required to pay. These amounts he promptly paid in full to the defendants.

It appears from the evidence that the property in question had been purchased in February, 1887, from one Drake by one of the defendants, who gave back a purchase-money mortgage for $2,000, and that in May, 1887, the absolute title of the whole property stood in his name, although it was entered on the defendants' books as belonging to another "investment," called "No. 41," at the price of $4,100, viz., cash $2,100, and mortgage $2,000; also that defendants had the entire control of the sale of the property. It also appears that all that was done by defendants in the way of purchasing the property for plaintiff and his co-investors was to make entries on their books "closing out" investment No. 41, and entering the property as transferred to "investment No. 84," and at the same time executing a deed (not of trust, but absolute,) of the property to Hurd, which was placed on record, and immediately taking back from Hurd a deed, also absolute in form, to themselves, which they did not place on record. Defendants say this last deed was merely held "in escrow," but the facts show that it was in law delivered, so that the title was in the defendants just as it was before. In all that was done in purchasing this property for plaintiff and others, the defendants were both sellers and buyers,—a fact not communicated to their principals. Indeed, it can hardly be termed a purchase at all, for all that was done consisted of mere book-keeping. In March, 1889, the defendants, having placed on record the deed of reconveyance from Hurd to themselves, executed a mortgage on the entire property to one Flatt, to secure $2,000, payable in five years, with interest at 8 per cent. per annum, payable semi-annually. It is not pretended that plaintiff authorized this, or ever knew of it until he saw the deed and mortgage on record, when he promptly demanded the return of his money.

Defendants' excuse for giving the mortgage is that some of the investors in "investment No. 84" had defaulted in paying their assessments to pay the Drake mortgage of $2,000, by reason of which they (defendants) had to advance some money for that purpose, and that they gave the other mortgage to reimburse themselves for the money

they had thus advanced, and what they expected to have to advance for taxes and assessments on the property during the next few years, before it could be sold. But, at least so far as the plaintiff was concerned, who was not in default, but had paid in full his share of the incumbrance on the property, the act of defendants in thus treating the property as their own, and placing it out of their power to give, and out of the power of the plaintiff to obtain, a good title to any part of it for at least five years, was utterly inconsistent with the idea that they held the title in trust, and amounted to a repudiation of any such trust, if one in fact ever existed.

Loyalty to his trust is the first duty of an agent, and he must not put himself in relations antagonistic to his principal. An agent authorized to purchase may not purchase from himself without his principal's consent; and, if he does, the principal, upon ascertaining the fact, may repudiate; and it makes no difference that the principal was not injured. There were at least two acts of the defendants which authorized the plaintiff to repudiate their action as his agents, and to demand a return of his money: (1) The concealment of the fact that they were really the sellers of the property which they assumed to buy for him; (2) treating the property as their own by mortgaging it, and thus placing it out of their power to give, and out of his power to obtain, an unincumbered title.

Order affirmed.